1
2
3
4
5
6
7
8
9
10                    UNITED STATES DISTRICT COURT
11                 SOUTHERN DISTRICT OF CALIFORNIA
12

13  CENTER FOR BIOLOGICAL                CASE NO: 09-CV-2216 W (CAB)
    DIVERSITY, et al.,
14                                        ORDER:
15                        Plaintiffs,
                                          (1) DENYING PLAINTIFFS'
16       v.                               MOTION FOR SUMMARY
                                          JUDGMENT [DOC. 21], AND
17
18  UNITED STATES FISH AND               (2) GRANTING DEFENDANTS'
    WILDLIFE SERVICE, et al.,            CROSS-MOTION FOR SUMMARY
19                                        JUDGMENT [DOC. 24]
                          Defendants.
20

21

22        On October 7, 2009, Plaintiffs Center for Biological Diversity, Sierra Club, Desert

23  Protective Council, Public Employees for Environmental Responsibility, Desert

24  Survivors, and San Bernardino Valley Audubon Society filed their complaint against

25  Defendants United States Fish and Wildlife Service and Ken Salazar, Secretary of the

26  Interior, (collectively, the "Service" or "Defendants") alleging violations of the

27  Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544.  Now pending before the

28  Court are the parties' cross-motions for summary judgment.

The Court finds that oral argument would not materially assist in deciding the motions before it. Therefore, the Court **DENIES** Defendants' request for oral argument, and decides the matter on the papers submitted. See Civ. L.R. 7.1(d.1). For the following reasons, the Court **DENIES** Plaintiffs' motion for summary judgment (Doc. 21), and **GRANTS** Defendants' cross-motion for summary judgment (Doc. 24).

## I.   BACKGROUND[1]

### A.   The Peninsular Bighorn Sheep

*Ovis canadensis nelsoni*, Peninsular bighorn sheep ("PBS"), are a distinct population segment ("DPS") that live in the Peninsular Ranges of southern California to Baja California, Mexico. 72 Fed. Reg. 57740, 57741 (Oct. 10, 2007). (AR 5916.) The Peninsular bighorn DPS is reproductively isolated from other desert bighorn sheep. (AR 5916.) However, they are similar in appearance. 66 Fed. Reg. 8650, 8650 (Feb. 1, 2001). (AR 1754.) The coat is pale brown, and the permanent horns, which "become rough and scarred with age," vary in color from yellowish brown to dark brown. (AR 1754.) The horns are "massive and coiled" in males; in females, they are smaller and not coiled. (*Id.*) Compared to other desert bighorn sheep, the PBS is generally described as having paler coloration and having horns with "very heavy bases." (*Id.*)

 In the United States, PBS occur in Riverside, San Diego, and Imperial counties. (AR 5916.) They occur on moderate to steep—greater than 20 percent—open slopes, canyons, and washes in hot and dry desert regions of the Peninsular Mountain Ranges of southern California. (*Id.*) PBS use several different habitat types, elevations, and slopes depending on season and activity involved. (*Id.*) Generally, they live between 300 and 4,600 feet, and are frequently found on slopes greater than 20 percent. (*Id.*) Steep terrains with slopes of 60 percent or greater used for predator evasion and lambing

---

[1] References to the Administrative Record will be designated as "AR" followed by the appropriate Bates-stamped number. References to the Supplemental Administrative Record will be designated as "SAR" followed by the appropriate Bates-stamped number.

1    are also a crucial component of PBS habitat.  (*Id.*)  The PBS use a wide variety of
2    landscapes for foraging depending on the season, rainfall, and the availability of forage
3    plants.  (*Id.*)  Their diets primarily consist of shrub species, but also include grasses and
4    forbs species.  (*Id.*)  Also, "[v]alley floors, rolling hills, and alluvial fans and washes with
5    productive soils provide seasonal vegetation and water resources important to the
6    [PBS], especially for ewes during the reproductive season."  (*Id.*)  PBS ewes generally
7    produce one lamb per year after a gestation of approximately six months.  (AR 5917.)

8

9        **B.    The ESA and Critical Habitat**

10       The ESA is "the most comprehensive legislation for the preservation of
11   endangered species ever enacted by any nation."  Tenn. Valley Auth. v. Hill, 437 U.S.
12   153, 180 (1978).  Congress passed the ESA in order to provide "a means whereby the
13   ecosystems upon which endangered species and threatened species depend may be
14   conserved," and to allow the populations of such species to recover to the point where
15   extinction is no longer a threat.  16 U.S.C. § 1531(b); Gifford Pinchot Task Force v.
16   U.S. Fish & Wildlife Serv., 378 F.3d 1059, 1070 (9th Cir. 2004).

17       Such protections first require a species to be listed as endangered or threatened.
18   An endangered species is "any species which is in danger of extinction throughout all
19   or a significant portion of its range."  16 U.S.C. § 1532(6).  And a threatened species
20   is "any species which is likely to become an endangered species within the foreseeable
21   future throughout all or a significant portion of its range."  Id. § 1532(20).  Additionally,
22   the term "species" includes any subspecies and any distinct population segment of any
23   vertebrate species.  Id. § 1532(16).

24       When listing a species as endangered or threatened, "to the maximum extent
25   prudent and determinable," the Service shall "concurrently . . . designate any habitat
26   of such species which is then considered to be critical habitat."  16 U.S.C. § 1533(a)(3).
27   The ESA defines "critical habitat" as:

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(i) the specific areas within the geographical area occupied by the species at the time it was listed . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

(ii) specific areas outside the geographical area occupied by the species at the time it is listed . . . upon a determination by the Secretary that such areas are essential for the conservation of the species.

Id. § 1532(5)(A). By Congressional mandate, conservation means "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." Id. § 1532(3). Once designated, the Service "may, from time-to-time thereafter as appropriate, revise" its critical habitat designation. Id. § 1533(a)(3)(A)(ii). After determining the geographic area that meets the two-pronged critical-habitat definition, the Service may, under Section 4(b), exclude certain portions of that area "if [it] determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless . . . the failure to designate such area as critical habitat will result in the extinction of the species concerned." Id. § 1533(b)(2).

The Endangered Species Committee Regulations also provide that "[w]hen considering the designation of critical habitat, the Secretary shall focus on the principal biological or physical constituent elements within the defined area that are essential to the conservation of the species." 50 C.F.R. § 424.12(b). "Known primary constituent elements shall be listed with the critical habitat designation." Id. Primary constituent elements ("PCEs") "may include, but are not limited to, the following: roost sites, nesting grounds, spawning sites, feeding sites, seasonal wetland or dryland, water quality or quantity, host species or plant pollinator, geological formation, vegetation type, tide, and specific soil types." Id. The PCEs define the "physical or biological features . . . essential to the conservation of the species" and are thus the basis—and logical starting point—for determining if an area must be designated as critical habitat. See 16 U.S.C. § 1532(5)(A).

C.    **The Critical Habitat Designation for the PBS**

According to the earliest range-wide population estimates, the PBS numbered about 971 individuals in 1972 and 1,171 individuals in 1974. 63 Fed. Reg. 13134, 13134 (Mar. 18, 1998); see also 50 C.F.R. § 17.11(h). (AR 109.) By 1996, the population dwindled to about 280 individuals. (AR 111.) This sharp decline has been attributed to habitat destruction and fragmentation, predation, disease, and low lamb recruitment. (AR 1754–55.) Following a petition from the San Gorgonio Chapter of the Sierra Club and a subsequent lawsuit by the Sierra Club Legal Defense Fund, the Service listed the PBS as endangered under the ESA on March 18, 1998. (AR 110, 112.)

At the time of listing, the Service did not designate critical habitat for PBS because it concluded that the designation was "not prudent." 65 Fed. Reg. 41405, 41408 (July 5, 2000). (AR 375.) Consequently, the Southwest Center for Biological Diversity and Desert Survivors filed a complaint challenging the "not prudent" conclusion. (AR 375.) Pursuant to a settlement agreement in that lawsuit, the Service issued a proposed critical habitat designation for the PBS on July 5, 2000, a Recovery Plan for the PBS on October 25, 2000, and a final critical habitat designation on February 1, 2001 ("2001 Designation"). (Id.) The 2001 Designation encompassed 884,897 acres of land that the Service deemed essential to the conservation of the PBS. (AR 1761.) However, in 2005, the Agua Caliente Band of Cahuilla Indians challenged this designation. Agua Caliente Band of Cahuilla Indians v. Norton, No. 05-cv-187-VAP-OP (C.D. Cal. July 31, 2006). That lawsuit was settled by a consent decree that remanded the 2001 Designation to the Service for revision, while partially vacating a portion of the designation covering 29,925 acres. (AR 5917.)

On October 10, 2007, following the remand, the Service issued a proposal to revise the PBS critical habitat ("2007 Proposed Rule"). (AR 5915.) The 2007 Proposed Rule designated 384,410 acres of land in Riverside, San Diego, and Imperial Counties. (Id.) Then, on April 14, 2009, following two rounds of public comment and two public hearings on the 2007 Proposed Rule, the Service issued its final revision of the PBS

critical habitat ("2009 Final Rule").  74 Fed. Reg. 17288, 17288-89 (Apr. 14, 2009).  (AR 19134–35.)  It excluded 43,549 acres of land under Section 4(b)(2) of the ESA and an additional 36,077 acres from the 2007 Proposed Rule's critical habitat designation.  (AR 19172.)  Ultimately, the 2009 Final Rule designated 376,938 acres of PBS critical habitat into four disconnected units—a 467,959 acre reduction from the 2001 Designation.  (AR 19134.)

## II.   STANDARD OF REVIEW[2]

Summary judgment is proper if the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Summary judgment is a particularly appropriate tool for resolving claims challenging agency action.  See Occidental Eng'g Co. v. INS, 753 F.2d 766, 770 (9th Cir. 1985).  As the administrative record constitutes the entire factual record in this case, there are no facts at issue between the parties, and the matter is ripe for summary judgment.

Judicial review of an agency's compliance with the ESA is governed by the Administrative Procedures Act ("APA").  Oregon Natural Res. Council v. Allen, 476 F.3d 1031, 1035 (9th Cir. 2007).  Under the APA, a reviewing court shall "hold unlawful and set aside agency action[s], findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Review under this standard is "searching and careful," but also "narrow."

---

[2] The Service initially argued that it was entitled to heightened deference under Lands Council v. McNair, 537 F.3d 981, 987 (9th Cir. 2008) (en banc), and Chevron, U.S.A. v. Natural Res. Def. Council, 467 U.S. 837, 842 (1984).  (Defs.' Cross-Mot. & Opp'n to Pls.' Mot. 8:9–9:4, 13:1–7 [Doc. 24].)  In response, Plaintiffs argued that these standards do not apply.  (Pls.' Opp'n to Defs.' Mot. & Reply in Supp. 2:1–7:7, 7 n.1 [Doc. 29].)  The Service did not address Plaintiffs' arguments in their Reply and thus have apparently abandoned these arguments.

1  Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378 (1989).  The court's role in

2  this situation is "not to substitute its judgment for that of the agency," but rather to

3  examine whether there is a "rational connection between the facts found and the choice

4  made" by the agency.  Nw. Envtl. Def. Ctr. v. Bonneville Power Admin., 477 F.3d 668,

5  687 (9th Cir. 2007) (quoting Motor Vehicle Mfgs. Ass'n v. State Farm Mutual Auto.

6  Ins. Co., 463 U.S. 29, 43 (1983)).  The agency must "cogently explain why it has

7  exercised its discretion in a given manner," and the reviewing court must determine

8  "whether the decision was based on a consideration of the relevant factors and whether

9  there has been a clear error of judgment."  State Farm, 463 U.S. at 43 (quoting Bowman

10  Transp., Inc. v. Ark.-Best Freight Sys., 419 U.S. 281, 285 (1974)).

11  An agency decision is arbitrary and capricious "if the agency has relied on factors

12  which Congress has not intended it to consider, entirely failed to consider an important

13  aspect of the problem, offered an explanation for its decision that runs counter to the

14  evidence before the agency, or is so implausible that it could not be ascribed to a

15  difference in view or the product of agency expertise."  State Farm, 463 U.S. at 43.  "An

16  agency is entitled to change its course when its view of what is in the public's interest

17  changes."  Bonneville Power Admin., 477 F.3d at 688.  However, when changing its

18  course, the explanation upon which the agency relies must be one that the agency itself

19  put forward in making its decision; the explanation may not be supplied after the fact

20  by the agency's attorney.  See id. at 687-88 (citing Bowman Transp., Inc., 419 U.S. at

21  285-86; Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).  A court

22  must "uphold a decision of less than ideal clarity if the agency's path may reasonably be

23  discerned . . . [but] may not infer an agency's reasoning from mere silence."  Arlington

24  v. Daniels, 516 F.3d 1106, 1112 (9th Cir. 2008).

25

26  **III.   DISCUSSION**

27  In this lawsuit, Plaintiffs challenge the Service's 2009 Final Rule for the PBS

28  primarily on three grounds.  First, they contend that the Service has not explained its

departure from the PBS Recovery Plan and the recommendations of PBS experts. Second, Plaintiffs argue that the Service's exclusion of all unoccupied PBS habitat is arbitrary and unlawful because it is not supported by any evidence in the record and is a further unexplained departure from the Recovery Plan. And third, they argue that the Service improperly excluded additional Coachella Valley Multiple Species Habitat Conservation Plan ("Coachella Valley MSHCP") and Agua Caliente Band of Cahuilla Indians lands under its Section 4(b)(2) authority. The Service responds that it has acted in accordance with the ESA by adequately explaining its methodology for delineating critical habitat, and appropriately exercised its discretion under Section 4(b)(2).

## A.   The Service Adequately Explained Its Departure from the PBS Recovery Plan's Methodology to Delineate Critical Habitat.

As outlined above, when identifying areas that meet the definition of critical habitat in the geological area occupied by a species at the time of listing, the Service must identify the "physical or biological features . . . essential to the conservation of the species and . . . which may require special management considerations or protection." 16 U.S.C. § 1532(5)(A)(I). To aid the Service in identifying these "physical or biological features," the Service's regulations refer to PCEs. 50 C.F.R. § 424.12(b)(5). Specifically, the regulations provide that these PCEs should include but are not limited to attributes such as: (1) space for individual and population growth, and for normal behavior; (2) food, water, air, light, minerals, or other nutritional or physiological requirements; (3) cover or shelter; (4) sites for breeding, reproduction, rearing of offspring, germination, or seed dispersal; and (5) habitats that are protected from disturbance or are representative of the historic geographical and ecological distributions of a species. 50 C.F.R. § 424.12(b).

Despite Plaintiffs' contention that the Service failed to give *any* explanation regarding its departure from the Recovery Plan and the recommendation of various

experts, the record shows otherwise.  In the 2009 Final Rule, the Service explained that the "deviation from the Recovery Plan boundary and the 2001 critical habitat designation is primarily the result of using a revised methodology to delineate critical habitat," and that the "revised methodology incorporates new information to best identify areas that meet the definition of critical habitat."  (AR 19170.)  A detailed examination of the record supports this explanation.  The record shows that the Service responded to numerous peer reviewers' comments, and provided a step-by-step explanation of how it determined the revised critical-habitat boundary for the PBS presented in the 2009 Final Rule.

The Service first reevaluated and revised the PCEs in light of subsequent and other relevant case law.  (AR 19161.)  It then explained that the "PCEs differ from those in the [2001 Designation] in that they are reorganized into five separate PCEs for clarity."  (*Id.*)  Accordingly, the Service identified areas that met the definition of critical habitat as defined in the ESA (AR 19165–68; *see also* AR 5918–20), and then determined that the PBS PCEs are:

> (1) Moderate to steep, open slopes (20 to 60 percent) and canyons, with canopy cover of 30 percent or less (below 4,600 ft (1,402 m) elevation in Peninsular Ranges) that provide space for sheltering, predator detection, rearing of young, foraging and watering, mating, and movement within and between ewe groups;
>
> (2) Presence of a variety of forage plants, indicated by the presence of shrubs . . . and cacti . . . that provide a source of forage in the fall, and forbs . . . that provide a source of forage in the spring;
>
> (3) Steep, rugged slopes (60 percent slope or greater) (below 4,600 ft (1,402 m) elevation in Peninsular Ranges) that provide secluded space for lambing and terrain for predator evasion;
>
> (4) Alluvial fans, washes, and valley bottoms that provide important foraging areas where nutritious and digestible plants can be more readily found during times of drought and lactation, and that provide and maintain habitat connectivity by serving as travel routs between and within ewe groups, adjacent mountain ranges, and important resource areas (e.g., foraging areas and escape terrain); and
>
> (5) Intermittent and permanent water sources that are available during extended dry periods and provide relatively nutritious plants and drinking water.

1  (AR19168.)

2      These determinations were based primarily on studies that pre-date the 2001

3  Designation, but still relied on studies published after it.[3]  For example, when discussing

4  how the PBS is primarily restricted to east-facing lower-elevation slopes of the

5  Peninsular Ranges, the Service cited, among other sources, a 2002 study on mountain

6  lion predation of the PBS by H.B. Ernest, E.S. Rubin, and W.M. Boyce.  (AR 19127,

7  19166.)  In another example, when discussing how the PBS use its climbing abilities on

8  mountainous slopes greater than or equal to 60 percent rather than its speed to escape

9  from predators, the Service cited, among other sources, a 2003 Geographic Information

10  System ("GIS")-based evaluation of escape terrain and desert bighorn sheep populations

11  by T. McKinney, S.R. Boe, and J.C. deVos, Jr.  (AR 19128, 19166.)  Though a majority

12  of the studies cited pre-date the 2001 Designation, the 2009 Final Rule nonetheless

13  considered new scientific information to adequately explain the revised PCEs.

14      Next, based on a "revised methodology [that] incorporates new information to

15  best identify areas that meet the definition of critical habitat," the Service used habitat

16  use and selection data—representing an approximate PBS population of 800

17  individuals—to identify which specific PCEs were actually used by the PBS.  (AR

18  19169.)  The Service explained that since the time of listing, the acquisition of "tens of

19  thousands" of additional occurrence and sheep-use data points provided

20
21      a more accurate and specific representation of the areas consistently
        occupied by PBS.  Not all sheep are collared, but ewe groups generally do
22      not migrate far from their natal home range and few collared sheep in

23  —————————————————————

24  [3] In addition to arguing that the Service failed to provide *any* explanation for its
    revision, Plaintiffs also suggest that the Service should support its revision with *new* scientific
25  evidence.  (*Pls.' Opp'n to Defs.' Mot. & Reply in Supp.* 8:21–23.)  However, Plaintiffs fail to cite
    any legal authority to support that assertion.  They cite <u>Rock Creek Alliance v. U.S. Fish and</u>
26  <u>Wildlife Service</u>, 390 F. Supp. 993, 1010 (9th Cir. 2005), but the pertinent proposition in this
    case states that "a change in [an agency's] conclusion must be explained."  Though the Court
27  rejects Plaintiffs' suggestion, the following discussion shows that the Service nonetheless
28  considered new scientific evidence.

those groups can accurately reflect the area used by the ewe group. Large expanses of habitat . . . in which we have no evidence to support PBS using those areas historically or recently at the time of the 2001 [critical habitat] designation remain unused by PBS or unsupported by occurrence data today.

(AR 18804–05.) Based on this and other data (AR 19170), the Service used a four-step process to delineate critical-habitat boundaries. (AR 19171.) These four steps were: (1) mapping areas that contain the PCEs required by the DPS as determined from aerial imagery and GIS data on vegetation, elevation, and slope, and delineating revised units to ensure that they capture the PCEs; (2) mapping ewe group areas from a 1998 E.S. Rubin study over GIS imagery of the Peninsular Ranges to delineate the distribution of ewe groups in the proposed revised critical habitat; (3) comparing ewe group delineation; and (4) examining all pre-listing occurrence data to determine if the revised critical habitat missed any areas historical repeated PBS use. (*Id.*)

In presenting each step, the Service explained what data it used and why it used that particular data. (*See* AR 19171.) For example, in the second step, the Service identified a 1998 study by E.S. Rubin as the "best available data on [PBS] ewe group distribution," and then found that "the ewe groups presented in Rubin *et al.* (1998) accurately depict[ed] the general locations of the known ewe groups in these ranges, providing a logical proxy to help identify those areas containing the physical and biological features essential to the conservation of the [PBS]." (*Id.*) And in the third step, the Service

compared the ewe group delineation from Rubin *et al.* (1998, pp. 539–561) with all occupancy data since 1998 on GIS imagery maps to: (1) Ensure that Rubin *et al.* (1998, pp. 539–561) accurately represents the boundaries of the ewe groups at larger population levels; (2) capture possible ram movement; and (3) capture other areas used by bighorn sheep in recent years.

(*Id.*) Again, the Service explained and considered new scientific information to support its revised critical-habitat boundaries.

Plaintiffs also point out that the Service disagreed with a number of the peer reviewers who commented on the revised critical habitat designation in the 2009 Final

Rule, and failed to consider these peer reviewers' recommendations. However, the record again shows otherwise. In the 2009 Final Rule, the Service dedicated 27 pages to respond to 78 comments submitted by peer reviewers. (AR 19135–60.) Plaintiffs highlight the exclusion of linkage habitat deemed essential in the Recovery Plan and by peer reviewers as a major point of contention. (*Pls.' Mot.* 10:16–12:1 [Doc. 21-1]; *Pls.' Opp'n to Defs.' Mot. & Reply in Supp.* 11:1–17.) The Response to "Comment 1" addressed this exact issue. (AR 19135–36.) There, the Service explained that the "best available data do[es] not provide any information indicating what areas, if any, [PBS] use as connectivity corridors" between disconnected units of critical habitat. (AR 19136.) It supported this explanation by referencing specific occurrence data that has not shown connectivity corridors between the disconnected units. (*Id.*) The Service went on and stated that "[t]he deviation from the [PBS] Recovery Plan boundary and the 2001 final critical habitat designation is primarily the result of using a revised methodology to delineate habitat." (*Id.*) Even though there was disagreement between the Service and peer reviewers, the Service nonetheless considered and responded to the peer reviewers' comments. And many of these responses included explanations that cited relevant scientific information or law. (*See, e.g.,* AR 19137–40.)

In short, the issue here is whether the Service adequately explained its departure from the Recovery Plan. And the record shows that it did. The Service sums up its departure as follows:

> The broad-based methodology used to delineate critical habitat in the 2001 critical habitat rule (and 2000 Recovery Plan) included large expanses (hundreds of thousands of acres) of habitat (including very general connectivity areas and low-elevation habitat) which were determined to be essential at the time. However, upon reevaluation of the data available at that time, data obtained since, and our revised methodology for delineating critical habitat, we find that areas were included in the 2001 designation that do not meet the definition of critical habitat. Given the more detailed nature of the currently available scientific information, it is not appropriate to continue to use the broad-based methodology used in the 2001 designation. Incorporating the available data allowed us to examine sheep use during a period documented to exhibit large fluctuations in the DPS population levels. As a result, we identified those areas that exhibit substantial sheep activity at

1   a broad spatial distribution.  In other words, the availability of sheep
2   occurrence data provided us the opportunity to use this information as a
    proxy to better define and capture in the final revised critical habitat
3   boundary those areas containing the physical and biological features
    essential to the conservation of the Peninsular bighorn sheep.

4   (AR 19170–71.)  The Service provided a more than adequate step-by-step explanation

5   of how they determined the revised critical-habitat boundary for the PBS, taking into

6   consideration the best data available at the time.  Although there are portions of the

7   2009 Final Rule that are less than ideal in clarity, the rationale behind the Service's

8   departure from the Recovery Plan and its decision to revise the critical habitat

9   designation is easily and reasonably discerned from the record—the Service sought to

10  make its approach to PBS recovery more accurate and precise.

11      Accordingly, the Service adequately explained its departure from the PBS

12  Recovery Plan, and its decision was not arbitrary or capricious.[4]

13

14      **B.    The Service Appropriately Excluded Unoccupied PBS Habitat.**

15      Critical habitat also includes "specific areas outside the geographical area

16  occupied by the species upon a determination by the Secretary that such areas are

17  essential for the conservation of the species."  16 U.S.C. § 1532(5)(A)(ii).  The ESA

18  imposes "a more onerous procedure on the designation of unoccupied areas by requiring

19  the Secretary to make a showing that unoccupied areas are essential for the

20  conservation of the species."  Ariz. Cattle Growers' Ass'n v. Salazar, 606 F.3d 1160,

21  1163 (9th Cir. 2010); see also 50 C.F.R. § 424.12(e).  Service regulations elaborate:

22  "[t]he Secretary shall designate as critical habitat areas outside the geographical area

23  presently occupied by a species *only when* a designation limited to its present range

24  would be inadequate to ensure the conservation of the species."  50 C.F.R. § 424.12(e)

25

26      [4] In light of the Court's determination that the Service adequately explained its
27  departure from the PBS Recovery Plan, the Court rejects Plaintiffs' argument that the 2009
    Final Rule does not promote PBS recovery.  (*Pls.' Mot.* 15:12–17:10; *Pls.' Opp'n to Defs.' Mot.*
28  *& Reply in Supp.* 13:7–15:11.)

1  (emphasis added).  Thus, "[t]he Service regulation prohibits designation of unoccupied

2  lands unless designation of occupied lands is insufficient."  Cape Hatteras Access

3  Preservation Alliance v. U.S. Dep't of the Interior, 344 F. Supp. 2d 108, 125 (D.D.C.

4  2004).

5       Plaintiffs argue that the Service's determination that all unoccupied habitat is no

6  longer essential is unpersuasive because "[t]he Service identifies no evidence indicating

7  that the excluded areas are not essential to the conservation of the PBS."  (Pls.' Opp'n

8  to Defs.' Mot. & Reply in Supp. 12:14–18.)  Though there indeed is scant evidence that

9  the Service considered unoccupied areas in detail, Plaintiffs miss the point.  The Service

10  needs to consider designating unoccupied area only when it determines that the present

11  range would be inadequate.  See 50 C.F.R. § 424.12(e).  The record does not show that

12  this threshold determination was made.  To the contrary, the Service found that "[t]he

13  occupied areas identified as containing the features essential to the conservation of the

14  [PBS] in [the 2009 Final Rule] accurately represent the areas inhabited by the current

15  population which is at a size approaching recovery levels."  (AR 19169.)  In short, the

16  critical habitat designated in the 2009 Final Rule is adequate.  (See id.)  Consequently,

17  designation of unoccupied habitat is prohibited.  See Cape Hatteras Access Preservation

18  Alliance, 344 F. Supp. 2d at 125.

19       Accordingly, the Service did not arbitrarily or capriciously exclude unoccupied

20  habitat.

21

22      **C.**    **The Service Appropriately Exercised Its Discretion Under Section**

23            **4(b)(2) of the ESA In Excluding Areas from Critical Habitat**

24            **Designation.**

25       Under Section 4(b)(2) of the ESA, the Service must designate critical habitat

26  based on the "best scientific data available and after taking into consideration the

27  economic impact, and any other relevant impact, of specifying any particular area as

28  critical habitat."  16 U.S.C. § 1533(b)(2).  When using this and other relevant data to

inform its decision, the Service has wide discretion in determining whether to exclude particular areas.  Ariz. Cattle Growers' Ass'n v. Kempthorne, 534 F. Supp. 2d 1013, 1032 (D. Ariz. 2008).  It may exclude areas from critical habitat when it "determines that the benefits of such exclusion outweigh the benefits of specifying such areas as part of the critical habitat," provided that exclusion will not result in the extinction of the species.  Id.  In making this determination, the Service retains the discretion as to the consideration and weight given to any particular impact.  See Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv., No. S-05-629, 2006 WL 3190518, at *21 (E.D. Cal. Nov. 2, 2006).  The agency abuses its discretion where its "decision is based on an erroneous conclusion of law or when the record contains *no evidence* on which it could have rationally based that decision."  Mendenhall v. Nat'l Transp. Safety Bd., 92 F.3d 871, 874 (9th Cir. 1996) (citations omitted) (emphasis added).

### 1.   *Coachella Valley MSHCP*

The Coachella Valley MSHCP is a large-scale, multi-jurisdictional habitat conservation plan encompassing about 1.1 million acres in the Coachella Valley designed to "establish a multiple species habitat conservation program that minimizes and mitigates the expected loss of habitat and the incidental take of covered species." (AR 19184–85.)  The PBS is one of the 27 "covered species" under the plan.  (AR 19184.)  Implementation of the plan will establish a Reserve System, divided into 21 conservation areas where *at least* 90 percent of each division will be conserved.  (*Id.*) Furthermore, the plan contains conservation goals, conservation objectives, and required measures that will ameliorate the negative effects of development on the PBS habitat.  (*Id.*)

The Service excluded 38,759 acres of land covered by the Coachella Valley MSHCP from the critical habitat designation under Section 4(b)(2) after concluding that the benefits of exclusion outweighed the benefits of including the area in the critical habitat designation.  (AR 19185.)  It determined that the benefits of including

this area would be minimal because of the conservation measures provided by the MSHCP.  (AR 19186.)  These conservation measures include:

> preservation and protection of core [PBS] habitat in perpetuity, maintenance of water sources, criteria for locating development to minimize effects to [PBS], implementation of minimization and mitigation measures and land use agency guidelines, conditional provisions regarding unauthorized trails, and monitoring the effects of trails and population monitoring.

(*Id.*)  The Service also identified several benefits from excluding this area, including "eliminating an essentially redundant layer of regulatory review . . . [,] helping preserve [the Service's] ongoing partnership with plan participants, and encouraging new partnerships with other landowners and jurisdictions."  (AR 19187.)  Based on these determinations, the Service concluded that the benefits of exclusion outweighed the benefits of inclusion.  (*Id.*)

Plaintiffs argue that the critical habitat designation and the MSHCP are entirely distinct and independent.  (*Pls.' Opp'n to Defs.' Mot. & Reply in Supp.* 16:13–20.)  Specifically, in response to the Service's finding that excluding the Coachella Valley MSHCP land would eliminate "an essentially redundant layer of regulatory review," they direct the Court to the preauthorization for development to occur without any consideration of destruction or adverse modification of habitat.  (*Id.*)  Plaintiffs also argue that the Service's "'partnership' reasoning" does not apply to public entity partners, and that the "ongoing relationship" with MSHCP permittees is not limited by a critical habitat designation.  (*Id.* at 16:21–17:5.)

The Service explained that the conservation benefits of including this area were minimal because

> the Coachella Valley MSHCP address conservation issues from a coordinated, integrated perspective rather than a piecemeal, project-by-project approach (as would occur on these lands under sections 7 and 10 of the Act absent this regional plan) and will arguably achieve more [PBS] conservation within the Coachella Valley MSHCP Plan Area than through section 7 consultations involving consideration of critical habitat.

(AR 19186.)   Furthermore, the Service "acknowledge[d] that some of the lands excluded within the Coachella Valley MSHCP are permitted for development (*approximately 0.7 percent*)," and despite that, it determined that "the potential loss of this habitat will not result in the extinction of [the PBS]."  (AR 19188 (emphasis added).)  Given the extremely small percentage of the area that is preauthorized for development, the Service's conclusion is reasonable.  See Home Builders Ass'n of N. Cal., 2006 WL 3190518, at *30-31 (finding that the exclusion of a critical habitat covered by a comprehensive resource management plan, a county MSHCP, and Department of Defense was reasonable given the Service's determination that the benefits outweighed inclusion).  Additionally, excluding critical habitat area in order to preserve conservation partnerships is a legitimate factor that the Service may consider and give weight to.  Ctr. for Biological Diversity v. Norton, 240 F. Supp. 2d 1090, 1105 (D. Ariz. 2003.)  The Service explained the value of these partnerships in the 2009 Final Rule.  (*See* AR 19177–79.)

        For these reasons, the Service appropriately exercised its discretion under Section 4(b)(2), and its decision to exclude the PBS critical habitat covered by the Coachella Valley MSHCP was not arbitrary or capricious.

### 2.    *Agua Caliente Band of Cahuilla Indians Tribal Lands*

        The Service also excluded 4,790 acres of land under the jurisdiction of the Agua Caliente Band of Cahuilla Indians after determining that the benefits of exclusion—namely, the crucial need to maintain "an effective working relationship and mutual partnership with the Agua Caliente Band of Cahuilla Indians to promote the conservation of the [PBS] and other sensitive species"—outweighed the benefits of keeping the area in the critical habitat designation, which the Service found to be small in light of the Tribe's current sustained management of PBS habitat "consistent with the conservation of the [PBS]."  (AR 19184.)  The Service also determined that exclusion will not result in the extinction of the PBS.  (*Id.*)

1    Plaintiffs argue that the exclusion of the Tribal land improperly relies on an
2  unadopted tribal habitat conservation plan.  (*Pls.' Opp'n to Defs.' Mot. & Reply in Supp.*
3  17:18–21.)  However, they also concede that the Service based its decision to exclude
4  this land for the benefit of maintaining "an effective working relationship and mutual
5  partnership with the Agua Caliente Band of Cahuilla Indians to promote the
6  conservation of the [PBS] and other sensitive species." (*Id.* (citing AR 19183).)  As the
7  Court already stated above, excluding critical habitat area in order to preserve
8  conservation partnerships is a legitimate factor that the Service may consider and give
9  weight to.  <u>Ctr. for Biological Diversity</u>, 240 F. Supp. 2d at 1105 (finding that the
10  Service's decision to exclude critical habitat in the San Carlos Apache lands in order to
11  preserve the Service's working relationship with the Tribe is entitled to deference).  The
12  linchpin of the Service's decision to exclude this area is the partnership with the Tribe,
13  and not the habitat conservation plan.  Therefore, the Service appropriately exercised
14  its discretion under Section 4(b)(2), and its decision to exclude PBS critical habitat
15  under the jurisdiction of the Agua Caliente Band of Cahuilla Indians was not arbitrary
16  or capricious.

17  //
18  //
19  //
20  //
21  //
22  //

23

24  **IV.   CONCLUSION**

25    For the foregoing reasons, the Court **DENIES** Plaintiffs' motion (Doc. 21), and
26  **GRANTS** Defendants' cross-motion (Doc. 24).  Accordingly, the Court upholds the
27  Service's final designation of critical habitat.

28

DATED:  September 26, 2011

_____
Hon. Thomas J. Whelan
United States District Judge